UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
KENNETH JOHN CALDWELL,

                Plaintiff,

                                   <u>MEMORANDUM & ORDER</u>
       -against-                        17-CV-6486 (JS)

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                Defendant.
--------------------------------------X

APPEARANCES
For Plaintiff:       Francesca Zeltmann, Esq.
                     Persaud & Zeltmann
                     675 Broadway
                     P.O. Box 283
                     Massepequa, NY 11758

For Defendant:      Candace S. Appleton, Esq.
                     United States Attorney's Office
                     Eastern District Of New York
                     271 Cadman Plaza East
                     Brooklyn, NY 11201

SEYBERT, District Judge:

         Plaintiff Kenneth John Caldwell ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the Commissioner of Social Security's (the "Commissioner") denial of his application for Social Security Disability Insurance Benefits. (Compl., Docket Entry 1, ¶ 3.) Presently pending before the Court are the parties' cross-motions for judgment on the pleadings. (Pl.'s Mot., Docket Entry 11; Comm'r's Mot., Docket Entry 15.) For the following reasons, Plaintiff's motion is GRANTED IN PART and DENIED

IN PART and the Commissioner's motion is GRANTED IN PART and DENIED IN PART.

BACKGROUND[1]

On February 2, 2015, Plaintiff completed an application for disability insurance benefits alleging that since December 31, 2013, post-traumatic stress disorder ("PTSD"), depression, anxiety, sleep deprivation, phobia, memory loss, arthritis, back and knee pain, and an inability to focus have rendered him disabled. (R. 65, 160-61, 211.) After Plaintiff's claim was denied, (R. 65-75), he requested a hearing before an Administrative Law Judge ("ALJ"), (R. 84-85). On February 23, 2017, Plaintiff appeared with his attorney for a hearing. (R. 40-64.)

In a decision dated July 5, 2017, the ALJ found that Plaintiff was not disabled. (R. 24-34.) On September 7, 2017, the Social Security Administration's Appeals Council denied Plaintiff's request for review and the ALJ's decision became the final decision of the Commissioner. (R. 1-5.)

Plaintiff filed this action on November 8, 2017, (Compl.), and moved for judgment on the pleadings on April 5, 2018,

---

[1] The background is derived from the administrative record filed by the Commissioner on February 9, 2018. (R., Docket Entry 10.) "R." denotes the administrative record. For purposes of this Memorandum and Order, familiarity with the administrative record is presumed. The Court's discussion of the evidence is limited to the challenges and responses raised in the parties' briefs.

(Pl.'s Br., Docket Entry 11-1).  The Commissioner cross-moved for judgment on the pleadings on August 8, 2018, (Comm'r's Br., Docket Entry 16), and Plaintiff opposed the Commissioner's motion on August 26, 2018, (Pl.'s Reply, Docket Entry 18).

DISCUSSION

I.  Standard of Review

In reviewing the ruling of an ALJ, the Court does not determine de novo whether the plaintiff is entitled to disability benefits.  Thus, even if the Court may have reached a different decision, it must not substitute its own judgment for that of the ALJ.  See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).  If the Court finds that substantial evidence exists to support the Commissioner's decision, the decision will be upheld, even if evidence to the contrary exists.  See Johnson v. Barnhart, 269 F. Supp. 2d 82, 84 (E.D.N.Y. 2003).

II. The ALJ's Decision

Initially, the ALJ found that Plaintiff meets the insured-status requirements of his claim through December 31, 2018.  (R. 26.)  Next, the ALJ applied the familiar five-step disability analysis and concluded that Plaintiff was not disabled from December 31, 2013, the alleged disability-onset date, through July 5, 2017, the date of his decision.  (R. 26-34); see 20 C.F.R. § 404.1520.  At steps one through three, the ALJ found that (1) Plaintiff had not engaged in substantial gainful activity

since the alleged onset date, (R. 26); (2) Plaintiff had severe impairments consisting of depression, anxiety, and PTSD, as well as pain in his lumbar spine, right shoulder, and bilateral knees,[2] (R. 26-27); and (3) these impairments did not meet or medically equal the severity of any of the impairments listed in Appendix 1 of the Social Security regulations, (R. 27-29). The ALJ then determined that Plaintiff had the residual functional capacity ("RFC")

> to perform medium work as defined in 20 CFR 404.1567(c) except [he] is limited to unskilled tasks, defined by the Dictionary of Occupational Titles as SVP 1 or 2, in a low stress job, defined as having only occasional decision making and only occasional changes in the work setting, with only occasional interaction with the public and coworkers.

(R. 30-32.) Proceeding to steps four and five, the ALJ found that while (4) Plaintiff was unable to perform his past relevant work as a bus company owner and manager, (R. 32), (5) considering his RFC, age, education, and work experience, Plaintiff could make a successful adjustment to work existing in significant numbers in the national economy, (R. 32-33). As a result, the ALJ determined that Plaintiff was not disabled. (R. 34.)

---

[2] The ALJ determined that Plaintiff's right-sided inguinal hernia repair surgery was not a severe condition and that his history of obesity was not severe. (R. 27.)

III. <u>Analysis</u>

Plaintiff advances two primary arguments:  (1) The ALJ improperly assigned "less weight" to the opinion of treating physician Luigi Capobianco, M.D., regarding the impact of Plaintiff's mental impairments on his ability to work, (Pl.'s Br. at 12-15), and (2) the ALJ erred by giving "little weight" to the opinion of treating physician Leo Varriale, M.D., on the effect of Plaintiff's physical impairments on his work capacity, resulting in a physical RFC unsupported by medical evidence, (Pl.'s Br. at 15-17).  The Commissioner contends that the ALJ gave proper weight to the opinions and that substantial evidence supports the ALJ's RFC findings because (1) Dr. Capobianco's opinion is based on Plaintiff's subjective complaints and inconsistent with substantial evidence in the record, (Comm'r's Br. at 21-27), and (2) Dr. Varriale's opinion does not pertain to the relevant period and is inconsistent with medical evidence, (Comm'r's Br. at 27-30).

Under the "treating physician rule," "[t]he opinion of a treating physician is afforded 'controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.'" <u>Crowell v. Comm'r of Soc. Sec. Admin.</u>, 705 F. App'x 34, 35 (2d Cir. 2017) (quoting

<u>Burgess v. Astrue</u>, 537 F.3d 117, 128 (2d Cir. 2008)).  The Social Security regulations provide:

> Generally, we give more weight to opinions from your treating sources. . . . If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).[3]  Nevertheless, the opinions of a treating physician "'need not be given controlling weight where they are contradicted by other substantial evidence in the record.'"  <u>Monroe v. Comm'r of Soc. Sec.</u>, 676 F. App'x 5, 7 (2d Cir. 2017) (quoting <u>Veino v. Barnhart</u>, 312 F.3d 578, 588 (2d Cir. 2002)).

The Court will address Plaintiff's arguments concerning the weight given to the opinions of his treating physicians within the context of the ALJ's mental and physical RFC determinations.

### A.   Plaintiff's Mental RFC

---

[3] "While the Act was amended effective March 27, 2017 [to eliminate the treating physician rule], the Court reviews the ALJ's decision under the earlier regulations because the Plaintiff's application was filed before the new regulations went into effect."  <u>Williams v. Colvin</u>, No. 16-CV-2293, 2017 WL 3701480, at *1 (E.D.N.Y. Aug. 25, 2017); <u>see</u> <u>also</u> 20 C.F.R. § 404.1527 ("For claims filed (<u>see</u> § 404.614) before March 27, 2017, the rules in this section apply.  For claims filed on or after March 27, 2017, the rules in § 404.1520c apply.").

As discussed above, the ALJ found that Plaintiff had severe mental impairments of depression, anxiety, and PTSD. (R. 26.) His RFC finding limited Plaintiff to unskilled tasks in a low-stress job, "defined as having only occasional decision making and only occasional changes in the work setting, with only occasional interaction with the public and coworkers." (R. 30.) In determining Plaintiff's mental RFC, the ALJ weighed the opinions of Dr. Capobianco, Dr. Paul Herman, Dr. Kathleen Acer, Dr. Jennifer Blitz, and Dr. W. Skranovski.[4]

Plaintiff argues that the ALJ improperly gave "less weight" to Dr. Capobianco's opinion on the effect of Plaintiff's psychological issues on his ability to work. (Pl.'s Br. 12-15.) Dr. Capobianco is a family medicine physician who has treated Plaintiff since 2005. (R. 503, 508.) He provided his opinion in a "Mental Impairment Questionnaire" and a disability claim form, both dated February 5, 2017. (R. 503-08.) He diagnosed Plaintiff with bipolar disorder, major depression, and PTSD, and he opined

---

[4] Plaintiff contends that Dr. Skranovski is not an acceptable medical source who can render a medical opinion because he signed his name simply as "W. Skranovski," without indicating that he is a medical professional. (Pl.'s Reply at 1.) This argument is unconvincing, as this Court has encountered records from Dr. Skranovski in his capacity as an agency psychiatric consultant in numerous other cases. E.g., Williams, 2017 WL 3701480, at *4 (describing "Dr. W. Skranovski" as a "State agency psychiatric consultant"). However, the Court notes that the ALJ misspelled Dr. Skranovski's name as "Skranovsky." (R. 32, 73.)

that Plaintiff was restricted from being in stressful environments. (R. 508.) He opined further that Plaintiff had "moderate" limitations[5] in his ability to, among other things: understand and remember detailed instructions; carry out simple or detailed instructions; maintain attention and concentration for extended periods; make simple work-related decisions; complete a workday without interruptions; interact appropriately with the public; accept instructions and respond appropriately to supervisors; get along with coworkers or peers without distracting them; respond appropriately to workplace changes; travel to unfamiliar places; and make plans independently. (R. 506.) Additionally, he assessed "moderate-to-marked" limitations[6] in Plaintiff's capacity to perform activities within a schedule, consistently be punctual, and perform at a consistent pace without rest periods of unreasonable length or frequency. (R. 506.) Dr. Capobianco opined that Plaintiff would miss work more than

_____

[5] As defined by the Mental Impairment Questionnaire, a "moderate" limitation in a mental activity means that the claimant's symptoms are expected to "occasionally"--up to one-third of an eight-hour workday--interfere with his ability to perform that activity in a competitive environment on a sustained and ongoing basis--eight hours per day, five days per week. (R. 506.)

[6] The Mental Impairment Questionnaire defines a "moderate-to-marked" limitation as one that is expected to "frequently"-- between one-third and two-thirds of an eight-hour workday-- interfere with ability. (R. 506.)

three times per month, and he concluded that Plaintiff was unable to work. (R. 507-08.)

While the ALJ recognized that Dr. Capobianco was Plaintiff's treating physician, he assigned the opinion "less weight" because (1) Dr. Capobianco is not a mental health professional, but a family practitioner who does not provide psychotherapy and is not trained in mental health; (2) much of his opinion appears to be based on Plaintiff's subjective statements; and (3) the opinion is not supported by objective medical findings or Plaintiff's treatment history. (R. 27, 31.) Plaintiff does not dispute the first point but argues that (1) Dr. Capobianco's opinion is supported by clinical findings and not simply Plaintiff's subjective statements; (2) Dr. Capobianco's clinical findings are consistent with those of other treating and examining mental health professionals; and (3) the opinion is supported by medical evidence in the record. (Pl.'s Br. at 13-14.) The Court is unconvinced by Plaintiff's arguments.

1.  Plaintiff's Subjective Statements

Initially, the Court agrees with the ALJ that the "clinical findings" on which Dr. Capobianco based his opinion appear to be his notes of Plaintiff's subjective statements. Dr. Capobianco's records do not indicate that he assessed Plaintiff's mental health status or provided mental health therapy. (See generally R. 427-42.) Rather, his notes simply

list several diagnoses, symptoms, and medications without indicating whether he evaluated Plaintiff. For example, in notes dated July 2, 2015, Dr. Capobianco lists, without context, "unable to complete tasks, ↓ memory, partial withdrawal from society, memory ↓, + Depression, memory, LBP, Depression, [and] Anxiety," along with the names of several medications. (R. 431.) Similarly, on January 28, 2015, without indicating that he performed a mental evaluation, Dr. Capobianco noted "unable to do gainful employment" as one of Plaintiff's "[p]roblems." (R. 435.) Thus, the ALJ was not required to give Dr. Capobianco's opinion controlling weight. See Baladi v. Barnhart, 33 F. App'x 562, 564 (2d Cir. 2002) (quoting 20 C.F.R.§§ 404.1527(d)(2), 416.927(d)(2)) ("The treating physician's opinions were based upon plaintiff's subjective complaints of pain and unremarkable objective tests, and therefore the ALJ was not required to give that opinion controlling weight, as it was not 'well-supported by medically acceptable clinical and laboratory diagnostic techniques.'").

    2.   Inconsistencies with Opinions of Mental Health Professionals

Additionally, Dr. Capobianco's opinion is inconsistent with the opinions of mental health specialists. 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to

his or her area of specialty than to the medical opinion of a source who is not a specialist.")

First, it runs counter to the opinion of agency psychiatric consultant Dr. Skranovski. (R. 72-74); see Williams, 2017 WL 3701480, at *4. On August 28, 2015, Dr. Skranovski reviewed the record and opined that Plaintiff had no functional limitations; was able to memorize and carry out tasks, interact socially in a work setting, and adapt to changes; and was "not disabled" (which, as Plaintiff correctly points out, is a determination left to the Commissioner), (R. 73-74); see 20 C.F.R. § 404.1527(d)(1). Further, he noted that the functional limitations assessed by Plaintiff's provider--Dr. Capobianco-- were not supported by an examination or any objective data. (R. 73.) The ALJ gave Dr. Skranovski's opinion "some weight, as it is consistent with the record as a whole." (R. 32.)

Dr. Skranovski's report discusses the July 14, 2015 consultative examination report of psychologist Paul Herman, Ph.D., whose assessment Dr. Skranovski evaluated as part of his review. (R. 32, 73, 370-75.) In his report, Dr. Herman first extensively recounted Plaintiff's subjective complaints of psychiatric issues. (R. 371-72.) Then, upon mental status examination, he found Plaintiff to be "cooperative with adequate social skills." (R. 372.) Further, he found that Plaintiff's appearance, speech, and thought processes were normal; his affect

was "[d]ysthymic and tense"; his mood was "[n]eutral to depressed"; his attention and concentration were "[s]omewhat below average"; his cognitive functioning was average; his recent memory skills were "mixed" and his remote memory skills were below average; and his insight and judgment were currently fair, with a history of some variability. (R. 372-73.) Dr. Herman opined that:

> From a psychological/psychiatric perspective, there appears to be evidence of moderate to marked limitation intermittently and mild to moderate limitation chronically with respect to [Plaintiff's] ability to follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks, make appropriate decisions, relate adequately with others, and appropriately deal with stress at the level and consistency required to maintain employment.
>
> The results of the evaluation appear to be consistent with psychiatric problems, and these may moderately interfere with [his] ability to function on a daily basis, and intermittently at a marked level.

(R. 373-74.)

The ALJ gave Dr. Herman's opinion "less weight, as it is based upon a one-time examination that appears to have relied primarily on [Plaintiff's] self report of his symptoms and is not supported by the objective evidence of record." (R. 32.) Similarly, Dr. Skranovski drew different conclusions from Dr. Herman's mental status examination, providing that it

"show[ed] mildly impaired concentration and intact social/basic personal [activities of daily living]-related skills." (R. 73; see R. 372-73.) Additionally, he highlighted that Dr. Herman's report showed Plaintiff's ability to travel alone to the exam, "which requires intact memory/intact concentration." (R. 73.)

The Court agrees that the limitations outlined in Dr. Herman's opinion appear to reflect Plaintiff's complaints, rather than objective medical data. For example, Dr. Herman's mental status examination assessed Plaintiff's cognitive functioning to be "average," his attention and concentration to be only "[s]omewhat below average," and his insight and judgment to be currently "fair," yet he opined that there was evidence that Plaintiff was "moderate[ly] to marked[ly] limit[ed] intermittently and mild[ly] to moderate[ly] limit[ed] chronically with respect to his ability to follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, . . . [and] make appropriate decisions." (R. 373-74.) On the other hand, the opinion appears to accord with Plaintiff's subjective statements to Dr. Herman, like Plaintiff's "report that he is worn out by [his psychological issues], and he tried to take a job in the bus industry . . . but was unable to concentrate and focus." (R. 372.)

Second, Dr. Capobianco's opinion conflicts with the opinion of clinical psychologist Kathleen Acer, Ph.D., a

consultative examiner.    (R. 478-88.)    On December 20, 2016,
Dr. Acer diagnosed Plaintiff with major depressive disorder and
generalized anxiety disorder.    (R. 480.)    Unlike Dr. Capobianco
and Dr. Herman, (R. 373-74, 506), Dr. Acer opined that "there are
no limitations in his ability to . . . follow and understand
simple instructions and directions, appropriately perform simple
rote tasks, and maintain attention and concentration (at least on
a short-term basis)," (R. 480).    She noted further that "[h]e may
have some moderate limitations learning and performing complex
tasks independently, dealing with stress, and adequately relating
with others."  (R. 480.)

        Additionally, Dr. Acer completed a functional capacity
assessment and found "mild" restrictions--"slight limitation[s]"
that do not prevent Plaintiff from "generally function[ing] well"-
-in his ability to understand, remember, and carry out simple
instructions and make judgments on simple work-related decisions.
(R. 486.)  She assessed that he had "moderate" restrictions--"more
than [ ] slight limitation[s]" that do not prevent him from
"function[ing] satisfactorily"--in his capacity to understand,
remember, and carry out complex instructions; make judgments on
complex work-related decisions; interact appropriately with the
public, supervisors, and coworkers; and respond appropriately to
usual work situations and to changes in a routine work setting.
(R. 486-87.)  The ALJ gave Dr. Acer's opinion "some weight" because

                                14

while it "appear[ed] to be consistent with the overall evidence in the record," it was based only upon a one-time examination, and the results of intelligence testing that Dr. Acer performed were contradicted by other evidence in the record.  (R. 32.)

Third, while the Court finds that the opinion of impartial medical expert and clinical psychologist Jennifer Blitz, Psy.D., is not clearly inconsistent with Dr. Capobianco's opinion, any conclusion to the contrary by the ALJ is harmless.  (R. 32, 522-29.)  On March 7, 2017, at the ALJ's request, Dr. Blitz completed a medical interrogatory regarding Plaintiff's mental impairments.  (R. 32, 525-29.)  After reviewing the record, she stated that she could not form an opinion on the nature and severity of Plaintiff's impairments or the extent of Plaintiff's functional limitations resulting from his impairments.  (R. 525.) Specifically, Dr. Blitz stated that she reviewed Dr. Herman's consultative examination report indicating that Plaintiff was receiving ongoing psychiatric treatment, and that she needed the records of that treatment.[7]  (R. 370-75, 525; see R. 371 ("[Plaintiff] reports that he has been in outpatient treatment . . . [and h]e is currently seeing a psychiatrist and

---

[7] Plaintiff was not receiving psychiatric treatment at that time, but was only seeing his primary care physician, Dr. Capobianco. (R. 153 (disability insurance application dated April 21, 2015, on which Plaintiff indicated that he had not seen any physician or medical practitioner other than Dr. Capobianco in the previous twelve months).)  Thus, there are no such records.

therapist . . . .).)  Dr. Blitz concluded that "[r]ecords from all providers since [the alleged onset date] are needed to form an opinion, as [the consultative examination reports] are insufficient to do so."  (R. 525.)  The ALJ gave Dr. Blitz's opinion "great weight" because she reviewed the entire record and is an expert in the field.  (R. 32.)

Dr. Blitz states that she could not form an opinion on Plaintiff's alleged impairments because she needed more records, but the ALJ arguably interpreted her statement as contradicting Dr. Capobianco's finding of functional limitations.  (R. 32, 525.) However, as discussed herein, the ALJ's mental RFC finding and his decision to give "less weight" to Dr. Capobianco's opinion are supported by other substantial evidence in the record, so any error by the ALJ in giving Dr. Blitz's opinion "great weight" is harmless.  See Monroe, 676 F. App'x at 9.

### 3.  Dr. Capobianco's "Clinical Findings"

Plaintiff argues that Dr. Capobianco's "clinical findings" (which, as discussed above, appear to be a record of Plaintiff's subjective statements) are consistent with those of other treating and examining mental health professionals.  (Pl.'s Br. at 13-14.)  This argument fails for two reasons.

First, Dr. Capobianco's "findings" are inconsistent with some objective findings of mental health professionals in the record.  For instance, Plaintiff began psychiatric treatment with

16

Dr. Ketty Thertus, M.D., in September 2012, after attempting suicide following the death of a teenaged passenger in a bus owned by his company. (R. 342.) On mental status examinations in September, October, and November 2012 and January, February, and May 2013, Dr. Thertus found that Plaintiff was cooperative, with good eye contact; while he was "at baseline fidgety," he did not make abnormal movements; his speech was fluent, productive, rapid, and regular in volume and tone; his mood was "good"; his affect was reactive and stable; he was future-oriented; and his insight and judgment were fair. (R. 295, 298, 301-02, 304-05, 318, 345.) Dr. Thertus diagnosed him with bipolar disorder and opioid and alcohol abuse. (R. 296, 299, 302, 305, 318, 346.)

In contrast to Dr. Capobianco, as well as psychologist Dr. Robin Chapman, Ph.D., who treated Plaintiff from September 2012 to August 2014, Dr. Thertus did not diagnose Plaintiff with PTSD. (R. 348.) Moreover, unlike Dr. Capobianco, Dr. Thertus evaluated Plaintiff and found his "[m]emory and attention [to be] intact." (Compare R. 305 (Dr. Thertus' examination notes) with R. 431 (Dr. Capobianco's notes regarding Plaintiff's decreased memory).) Additionally, contrary to Dr. Chapman's observations, Dr. Thertus did not find that Plaintiff exhibited poor concentration, eye contact, or focus. (Compare, e.g., R. 304-05 with R. 348.) Similarly, Plaintiff's complaints to Dr. Thertus that he had been having trouble concentrating at work for the two

years preceding his November 2012 session (and thus, before the bus accident at the heart of Plaintiff's PTSD), (R. 295), contradict Dr. Chapman's view that Plaintiff's PTSD caused "changes in concentration and lack of persistence necessary to complete career related tasks," (R. 348).

Second, Dr. Capobianco's "findings" are somewhat consistent with those of other mental health professionals--for example, Dr. Acer's finding that he had anxious mood and affect and her diagnosis that he had major depressive disorder and generalized anxiety disorder. (R. 483-84.) However, that fact does not undercut the ALJ's finding that Dr. Capobianco's opinion on the effect of those impairments was grounded in Plaintiff's subjective statements, rather than objective evidence. (R. 31.) For instance, Dr. Capobianco's notes provide that Plaintiff's "[p]roblems" included anxiety, depression, and, notably, the inability "to do gainful employment." (R. 435.) However, there is no reference to testing or evaluation to support his ultimate conclusion that Plaintiff's impairments foreclosed the possibility of employment. (R. 508.) In contrast, as described above, mental health professionals evaluated Plaintiff and diagnosed similar impairments like depression, but they did not share (family practitioner) Dr. Capobianco's opinion that those impairments rendered Plaintiff incapable of work.

In light of the above, the Court concludes that the ALJ did not err in assigning "less weight" to Dr. Capobianco's opinion on the effect of Plaintiff's mental impairments on his ability to work.  Additionally, the ALJ's mental RFC finding, which includes limitations directly related to Plaintiff's assessed mental impairments, is supported by substantial evidence in the record and is affirmed.  See Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013) (citation omitted) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.").

B.  Plaintiff's Physical RFC

From a physical perspective, the ALJ found that Plaintiff was capable of "medium work," which "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." (R. 30); 20 C.F.R. § 404.1567(c).  The ALJ reviewed the opinions and notes of Dr. Varriale, Dr. Asad, and Dr. Capobianco in deciding Plaintiff's physical RFC.  (R. 31.)

Plaintiff argues that the ALJ erred by giving "little weight" to the opinion of his treating orthopedist, Dr. Leo Varriale, M.D., and by giving "less weight" to the opinion of consultative examiner Dr. Syeda Asad, M.D., regarding the effect

of Plaintiff's physical impairments on his ability to work. (Pl.'s Br. at 15-17; see R. 27, 31, 376-79, 491-94.)

### 1. Dr. Varriale

Dr. Varriale, an orthopedist who treated Plaintiff from 2005 to 2011, (R. 472-75), opined on August 17, 2015 that:

> [Plaintiff] has been disabled. He is unable to run or lift more than ten pounds and cannot sit or stand for long periods of time. He cannot do any significant stair climbing. Future surgery to the knees, back and right shoulder is a possibility . . . . He takes narcotic mediations to control pain which has been on a regular basis for the last several years. I do not believe he can work because he needs to take these medications continuously.

(R. 475.) The ALJ gave this opinion "little weight, as it is not supported by the evidence of record and is based upon evidence from before the relevant time period." (R. 31.)

Plaintiff argues that the ALJ erred because while Dr. Varriale's findings related to automobile accidents Plaintiff suffered in the past, "the physical ramifications and limitations [of those accidents], in no doubt, pertain to the period at issue." (Pl.'s Br. at 15.) Additionally, he argues that Dr. Varriale's opinion is supported by Dr. Capobianco's "[c]linical findings of a severe low back impairment." (Pl.'s Br. at 15.) The Commissioner maintains that the ALJ correctly found Dr. Varriale's opinion to be outdated and inconsistent with the evidence of record. (Comm'r's Br. at 27-28.)

Dr. Varriale's 2015 opinion is based on treatment ending in 2011 (two years before the alleged onset date) and is not supported by evidence in the record. <u>First</u>, Plaintiff's reported activities belie Dr. Varriale's grim opinion. For instance, Plaintiff went on a scuba-diving trip after he stopped seeing Dr. Varriale (but before the alleged onset date). (R. 295, 304 (noting in November 2012 that "[P]laintiff plans to take vacation in January [2013] to go scuba diving" and that his "[r]elationship with [his] girlfriend is going well," and noting in May 2013 that Plaintiff "was able to enjoy recent trips with [his girlfriend]").) Plaintiff also testified that he drove and repaired vehicles for his company until 2012 and that he spent more than three-quarters of the workday at his company "[s]tanding and moving and following up." (R. 45, 63-64.) In August 2014, Plaintiff reported that he went to the gym and rode a bike for an hour twice per week. (R. 354.) In December 2016, he reported that he could dress, bathe, and groom himself, as well as shop, drive, and clean. (R. 479, 492.)

<u>Second</u>, Dr. Varriale's opinion conflicts with medical evidence in the record. Since stopping treatment with Dr. Varriale, Plaintiff has not seen an orthopedist and has not had surgery or injections. (R. 491.) Rather, he continued to see his family general practitioner, mostly for his complaints of back pain. (See <u>generally</u> R. 427-42.) Additionally, on August 1, 2014,

Nurse Practitioner Maxine Hines examined Plaintiff before his hernia-repair surgery. (R. 353-61.) She noted that Plaintiff had no joint swelling, pain, or deformity and no limitation of movement, (R. 356, 358), though he suffered from arthritis and complained of lower back pain, (R. 356, 360). Finally, Dr. Varriale's opinion conflicts with the physical examination findings of Dr. Asad.

### 2. Dr. Asad

Dr. Asad, a consultative examiner specializing in nuclear medicine, examined Plaintiff on December 20, 2016. (R. 491-94.) She noted Plaintiff's complaints of lower back pain and bilateral knee pain but observed him to be in no acute distress and with a normal gait and station. (R. 491, 493.) Dr. Asad observed that he had difficulty walking on his toes, but not his heels, and that his "squat was only 1/3 of full." (R. 493.) He needed no assistive device, rose from his chair without difficulty, and needed no help changing for his exam, though he needed help getting on and off the exam table. (R. 493.) Upon examination of his cervical spine, Dr. Asad assessed full flexion, extension, lateral flexion, and rotary movements bilaterally, with no cervical or paracervical pain or spasm and no trigger points. (R. 493.) Dr. Asad's examination showed that the flexion and extension of Plaintiff's lumbar spine was forty degrees, his lateral flexion was fifteen degrees bilaterally, and his rotation

was fifteen degrees bilaterally. (R. 493.) There was no spinal, paraspinal, sacroiliac (SI) joint, or sciatic notch tenderness, and no spasm. (R. 493.) Plaintiff's straight-leg raise (SLR) was positive at sixty degrees bilaterally, but his sitting straight-leg raise was negative bilaterally, and he had no trigger points. (R. 493.) Plaintiff had a full range of motion in his hips and ankles, but his knees had a flexion and extension of fifty degrees bilaterally. (R. 493.) In his lower extremities, he had full strength in his proximal and distal muscles, no muscle atrophy, and no joint effusion, inflammation, or instability. (R. 493.) Plaintiff had full strength and range of motion in his upper extremities, as well, with no joint inflammation, effusion, or instability. (R. 493.) As relevant here, Dr. Asad diagnosed Plaintiff with lower back pain and bilateral knee pain. (R. 494.) She concluded that he had "mild to moderate limitations for squatting, kneeling, bending, walking, and standing for a long period of time." (R. 494.)

Dr. Asad also completed a medical source statement regarding Plaintiff's ability to engage in work-related activities. (R. 496-502.) She opined that Plaintiff could occasionally--up to one-third of the time--lift or carry up to ten pounds and never lift or carry eleven pounds or more. (R. 496.) According to Dr. Asad, during the course of an eight-hour workday, Plaintiff could sit for up to seven hours, stand for up to thirty

minutes, and walk for up to thirty minutes. (R. 497.) She opined that because of the limited range of motion in his knees, Plaintiff could never climb stairs, ramps, ladders, or scaffolds and never balance, stoop, kneel, crouch, or crawl. (R. 499.) She found that Plaintiff was capable of shopping, traveling without a companion for assistance, ambulating without substantial assistance, using standard public transportation, climbing a few steps using a single hand rail, preparing meals and feeding himself, caring for his personal hygiene, and sorting, handling, and using paper. (R. 501.) However, she opined that he was not able to walk a block at a reasonable pace on rough or uneven surfaces. (R. 501.)

The ALJ discussed Dr. Asad's examination notes, her conclusion that Plaintiff suffered mild to moderate limitations in various activities, and her medical source statement. (R. 31.) He concluded that Dr. Asad's opinion was entitled to "less weight" because the medical source statement "listed limitations far in excess of what would reasonably be expected from the physical findings." (R. 31.)

Plaintiff highlights Dr. Asad's medical source statement and argues that the ALJ ignored it. (Pl.'s Br. at 16.) The Commissioner contends that Dr. Asad's medical source statement conflicted with evidence in the record and stood "in stark contrast" to her examination findings. (Comm'r's Br. at 28-29.)

24

The Court concludes that the ALJ properly gave "less weight" to Dr. Asad's opinion. <u>First</u>, like Dr. Varriale's opinion, Dr. Asad's opinion conflicts with the evidence in the record discussed above. <u>Second</u>, the medical source statement conflicts with Dr. Asad's examination findings, which generally noted full strength and full range of motion in Plaintiff's joints, but with a limited squat and limited range of motion in his spine and knees. (R. 493-94.) For example, Dr. Asad found full strength in Plaintiff's lower extremities, observed normal gait and station, and noted that Plaintiff was not in acute distress. (R. 493.) She then assessed only "mild to moderate limitations for . . . walking[ ] and standing for a long period of time." (R. 494.) In contrast, in her medical source statement, Dr. Asad opined that Plaintiff could stand and walk only thirty minutes each in an eight-hour work day. (R. 497.) Rather than reflecting her examination, the opinion appears to track Plaintiff's subjective statements to Dr. Asad. (<u>E.g.</u>, R. 491 ("According to [Plaintiff], he has difficulty in walking due to the knee pain.").)

### 3. <u>Substantial Evidence</u>

However, the Court remands this matter for further development of the record because the physical RFC is not supported by substantial evidence. While an ALJ may rely on treatment notes and a claimant's activities of daily living in determining an RFC, <u>Monroe</u>, 676 F. App'x at 8-9, here, the Court is unable to locate

evidence from the relevant period that supports the ALJ's finding that Plaintiff is capable of the full physical range of medium work.

In concluding that Plaintiff could lift up to fifty pounds, the ALJ rejected (1) Dr. Asad's opinion that Plaintiff could occasionally lift or carry a maximum of ten pounds, but never more than that, (R. 496), (2) Dr. Varriale's opinion that he could not lift more than ten pounds, (R. 475), and (3) Plaintiff's testimony that he could lift approximately ten pounds, (R. 55). However, his rejection of that evidence left a gap in the record; Plaintiff's activities of daily living during the relevant period do not speak to how much weight Plaintiff could lift or carry, and Dr. Asad's examination notes and Dr. Capobianco's treatment notes do not provide additional insight. Thus, substantial evidence does not support the ALJ's conclusion that Plaintiff could engage in medium work (lift no more than fifty pounds and frequently lift and carry up to twenty-five pounds) as opposed to light work (lift no more than twenty pounds and frequently lift and carry up to ten pounds) or sedentary work (lift no more than ten pounds). 20 C.F.R. § 404.1567(a)-(c).

The absence of evidence on Plaintiff's ability to lift and carry is significant. Plaintiff, a high school graduate, was fifty-two years old, or "closely approaching advanced age," at the time he filed his claim. (R. 44, 66); 20 C.F.R. § 404.1563(d).

He was fifty-five years old, or an "advanced age," at the time of his hearing. (R. 44); 20 C.F.R. § 404.1563(e). The ALJ found that he could not perform his past relevant work as a bus company owner/manager, (R. 32), determined that he was limited to unskilled work, (R. 30), and did not make a finding on the transferability of his skills, (R. 33). Considering these factors, the Medical-Vocational Guidelines, known as the "Grids," could have resulted in a finding that Plaintiff was disabled if he was capable of only sedentary or light work. See 20 C.F.R. Pt. 404, Subpt. P, App'x 2, Rules 201.6, 201.14, 202.6; Clark v. Berryhill, 697 F. App'x 49, 50-51 (2d Cir. 2017); see also 20 C.F.R. § 404.1568(d)(4).

Therefore, the Court vacates the ALJ's physical RFC finding and remands this matter for further development of the record on the effect of Plaintiff's physical impairments on his ability to work.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion (Docket Entry 11) is GRANTED IN PART and DENIED IN PART and the Commissioner's motion (Docket Entry 15) is GRANTED IN PART and DENIED IN PART. The ALJ's mental RFC finding is AFFIRMED, but his physical RFC finding is VACATED. This matter is REMANDED for proceedings consistent with this Memorandum and Order, including

further development of the record regarding the effect of Plaintiff's physical impairments on his RFC.

The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED.


SO ORDERED


_____
Joanna Seybert, U.S.D.J.

Dated:      January __7__, 2019
            Central Islip, New York